# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

Jaretta L. Day,

                    **Plaintiff,**

v.                                                            **Case No. 06-2022-JWL**

Kraft Foods North America, Inc.,

                    **Defendant.**

## <u>MEMORANDUM & ORDER</u>

Plaintiff Jaretta L. Day filed suit against defendant, her former employer, alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981. This matter is presently before the court on defendant's motion for summary judgment (doc. 39). As will be explained, the motion is granted in part and denied in part.

## I.    Facts

The following facts are uncontroverted or related in the light most favorable to plaintiff, the nonmoving party. Plaintiff, an African-American female, began her employment with defendant in February 1999 as a "Sales Representative I" in Huntsville, Alabama. In that position, plaintiff was responsible for merchandising, shelving, selling and distributing new Kraft products.[1] In August 2000, plaintiff received a promotion to a Sales Representative II

---

[1]Merchandising refers to placing Kraft products in stores to display to consumers. Shelving refers to the percentage of Kraft products in stores and the location of Kraft products on shelves. Selling refers to placing orders for new Kraft products. Distributing refers to expanding new Kraft items within a store and building distribution of existing

position in the Kansas City region and she relocated to Kansas City.  Plaintiff's job responsibilities remained the same after her promotion.

In June 2001, plaintiff advised Loren Kern, her direct supervisor at the time, that she was interested in receiving a promotion to a Retail Category Manager (RCM) position.  RCMs are responsible for calling on store headquarters and setting sales advertisements.  RCMs are also responsible for greater sales volume than Sales Representatives.  In August 2001, three RCM positions became available in the Kansas City region and plaintiff again expressed an interest in promotion to the position.  Plaintiff did not receive an interview for the RCM position.  The three successful candidates were all Caucasian.  Jana Fitchett, defendant's Customer Business Manager at the time, was the sole decisionmaker with respect to the promotion decisions for the RCM positions.  According to defendant, Ms. Fitchett selected the three successful candidates based on their superior performance and plaintiff was not interviewed for the position because she was less qualified than each of the three successful candidates.

In December 2001 and January 2002, plaintiff expressed concern to various members of her management team that she had not received an interview for the open RCM positions.  In response to her concerns, defendant, in February 2002, placed plaintiff on a "development plan."  A development plan is utilized for those employees seeking career advancement within the organization and the purpose of a development plan is to assist the employee reach various performance markers necessary for advancement. As part of her development plan, plaintiff met

---

products.

with management on several occasions over the course of the next several months to discuss career advancement.  In early November 2002, plaintiff talked to Laura Nixon, defendant's Regional Manager, about her perception that defendant failed to train African-American sales employees, assigned African-American sales employees to undesirable routes and failed to promote African-American sales employees.  This occasion marked the first time that plaintiff complained to anyone in the organization about race discrimination.

On November 25, 2002, plaintiff was presented with her annual "managing and assessing performance" ("MAP") evaluation.  Plaintiff's direct supervisor at that time, Mike Schmidt, gave plaintiff an overall "more is expected" MAP rating after discussing that rating with Mr. Kern, plaintiff's former supervisor, and Mike Bokorae, defendant's Regional Category Planner and Mr. Schmidt's direct supervisor.  It is undisputed that none of these individuals knew at the time of plaintiff's MAP rating that plaintiff had raised concerns about race discrimination.  In any event, plaintiff, in early December 2002, filed a complaint with the Kansas Human Rights Commission (KHRC) alleging that she received a negative MAP rating in retaliation for her prior complaint to Ms. Nixon.

In late January 2003, Mssrs. Schmidt and Bokorae, in connection with their investigation of plaintiff's conduct during a sales contest, learned that plaintiff had filed a formal complaint against defendant.  By way of background, defendant launched a "Balance Bar" sales contest in early January 2003 to emphasize the Balance Bar product and to increase placement of the product in stores.  Sales representatives competed to place Balance Bars on the shelves of their assigned stores and each sales representative who placed Balance Bars in all of their assigned

3

stores received a $100 prize.  Toward that end, each sales representative was asked the following question with respect to each store to which he or she was assigned:  "Do you have 5 or more Balance Bar items on the shelf at this store?"  Plaintiff answered "yes" for each of her assigned stores.  Shortly thereafter, Mr. Schmidt, while visiting certain stores assigned to plaintiff, discovered that there were no Balance Bars in one of plaintiff's assigned stores and only two or three Balance Bars in another one of plaintiff's stores.  As a result, Mssrs. Schmidt and Bokorae decided to audit distribution of Balance Bars in the Kansas City region and each sales representative who answered that he or she had 5 or more Balance Bar items in each assigned store was audited by a Retail Sales Manager, who checked two stores on the employee's route. Following the audit, all sales representatives except for plaintiff were found to have the requisite number of Balance Bars in their audited stores.

On January 29, 2003, Mssrs. Schmidt and Bokorae, as well as a member of defendant's Human Resources team, met with plaintiff to discuss the Balance Bar contest and her representation that she had the requisite number of Balance Bars on the shelf at each of her assigned stores.  Plaintiff explained that, based on her understanding that a product is considered "on the shelf" when a store places an order for the product, she truthfully responded to the questions and had placed tags on the shelves where the product was to be placed by individual store managers.  Later that day, plaintiff submitted to Mssrs. Schmidt and Bokorae a written memorandum in which she again explained her conduct and further questioned whether the investigation was motivated by the formal complaint that she had filed against defendant the previous month.  It is undisputed that Mssrs. Schmidt and Bokorae received this memorandum

4

and, thus, first learned about plaintiff's complaint on January 29, 2003.  Plaintiff filed another

complaint with the KHRC on February 6, 2003 alleging that the Balance Bar investigation and

reprimand was retaliatory.  There is no evidence as to whether or when Mssrs. Schmidt and

Bokorae learned about this complaint.

On February 20, 2003, Mr. Schmidt, in coordination with Mr. Bokorae, issued plaintiff

a "Final Written Warning" based on her conduct in the Balance Bar contest.  The written

warning also referenced plaintiff's "continued deficient job performance" and plaintiff's "more

is expected" MAP rating.  The final paragraph of the written warning states as follows:

> In your 2002 year-end MAP, you were rated "More is Expected."  You are now
> being issued a Final Written Warning, with the hope that you will significantly
> improve your job performance and not engage in any further substandard conduct.
> We will develop a performance improvement plan for you in the near future.  Be
> advised, however, that any continued substandard behavior or job performance
> will result in further disciplinary action, up to and including termination.

Thereafter, plaintiff filed another complaint with the KHRC, alleging that the written warning

was issued in retaliation for her initial complaint.  Again, there is no evidence as to whether or

when Mssrs. Schmidt and Bokorae learned about this complaint.

As promised in plaintiff's final written warning, defendant placed plaintiff on a

performance improvement plan (PIP) in March 2003.  The PIP set forth various goals that

plaintiff was required to meet within 90 days.  As explained in the PIP, the 90-day performance

period began on March 13, 2003 and was scheduled to end on June 9, 2003.  As further

explained in the PIP, plaintiff faced termination at the end of the 90-day period if she "fail[ed]

to make significant progress against the plan."  Plaintiff met periodically with Mr. Schmidt over

the course of the 90 days and Mr. Schmidt provided plaintiff with oral and written feedback about her performance. It is undisputed that plaintiff's performance improved under the PIP but, as of May 2003, she had not yet met all of the goals established in the PIP. In early July 2003, defendant "extended" plaintiff's PIP by 30 days as a "last chance" for plaintiff to improve her performance.

On July 9, 2003, plaintiff received another "final written warning" after her direct supervisor, Shirley Erlbacher (who began supervising plaintiff in early July 2003 when Mr. Schmidt took short-term disability leave), attempted to contact plaintiff at one of plaintiff's assigned stores and plaintiff was not at the store as scheduled. On August 19, 2003, defendant terminated plaintiff's employment based on plaintiff's failure to meet her PIP objectives. The decision to terminate plaintiff's employment was made by Mr. Bokorae, Ms. Erlbacher and Ms. Nixon.

## II.   Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Lifewise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004). An issue is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Anderson v.*

6

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id*. (citing *Anderson*, 477 U.S. at 248).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id*. (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).  In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.  *Id.* (citing *Celotex*, 477 U.S. at 325).

If the movant carries this initial burden, the nonmovant that would bear the burden of persuasion at trial may not simply rest upon its pleadings; the burden shifts to the nonmovant to go beyond the pleadings and "set forth specific facts" that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant.  *Id.* (citing Fed. R. Civ. P. 56(e)).  To accomplish this, sufficient evidence pertinent to the material issue  "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein." *Diaz v. Paul J. Kennedy Law Firm*, 289 F.3d 671, 675 (10th Cir. 2002).

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."  *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1); *see also Kaster v. Safeco Ins. Co. of Am.*, 2003 WL 22854633, at *2 (10th Cir. Dec. 3, 2003) (affirming the district court's grant of summary judgment in favor of defendant in an ADEA case where the

plaintiff had failed to present evidence sufficient for a reasonable jury to conclude that Safeco's employment decisions were age-related); *Young v. White*, 2003 WL 21940941, at *1-2 (10th Cir. Aug. 14, 2003) (affirming district court's grant of summary judgment in favor of defendant in race discrimination and retaliation context).

## III.   Discussion

Plaintiff claims that defendant failed to promote her to an RCM position on the basis of her race and that defendant, on the basis of her race and/or in retaliation for her internal complaint of race discrimination and subsequent filing of charges with the KHRC, issued plaintiff a negative MAP rating; placed her on a PIP; issued her two written disciplinary warnings; and ultimately terminated her employment.  As plaintiff has no direct evidence of discrimination, her claims are analyzed using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1181 (10th Cir. 2006).  Under the *McDonnell Douglas* framework, plaintiff has the initial burden of establishing a prima facie case of discrimination or retaliation.  *See id.*  If she establishes a prima facie case, the burden shifts to defendant to articulate a legitimate, non-discriminatory or non-retaliatory reason for each of the adverse employment actions.  *See id.* If defendant meets this burden, summary judgment against plaintiff is warranted unless she shows that there is a genuine issue of fact as to whether defendant's reasons are pretextual.  *See id.*; *Medina v. Income Support Div., State of New Mexico*, 413 F.3d 1131, 1136 (10th Cir. 2005).

A.      *Plaintiff's Prima Facie Case*

In its motion for summary judgment, defendant contends that plaintiff has failed to establish a prima facie case with respect to her race discrimination claims because she cannot show that she was satisfactorily performing her job and because she has not identified any similarly situated non-minority employees who were treated more favorably than her.  Defendant also contends that plaintiff has failed to establish a prima facie case of retaliation because she cannot show the requisite causal connection between any protected activity on her part and any adverse employment actions taken by defendant.  As explained below, the court rejects defendant's arguments concerning plaintiff's prima facie case of race discrimination.  With respect to plaintiff's prima facie case of retaliation, the court concludes that plaintiff has not come forward with evidence demonstrating a causal connection between her protected activity and her MAP rating or her second "final" written warning because there is no evidence that the decisionmakers knew about plaintiff's protected activity at the time of the pertinent adverse action. With respect to plaintiff's remaining retaliation claims, however, the court concludes that plaintiff has come forward with sufficient evidence demonstrating a causal connection.

1.      Race Discrimination Claims

To establish a prima facie case of race discrimination, plaintiff must show that she was qualified for and satisfactorily performing her job.  *See Antonio*, 458 F.3d at 1183 n.3; *Haynes v. Level 3 Communications, LLC*, 456 F.3d 1215, 1225 n.11 (10th Cir. 2006).  According to defendant, plaintiff cannot establish that she was satisfactorily performing her job in the face of

uncontroverted evidence demonstrating plaintiff's "continuous poor performance."  The court rejects this argument.  Significantly, defendant also relies on plaintiff's asserted poor job performance as the reason for its adverse employment decisions.  This court, relying on established Tenth Circuit precedent, has repeatedly declined to analyze an employer's assessment of the plaintiff's performance at the prima facie stage where the employer (like defendant here) also asserts that the plaintiff's alleged deficient performance was the employer's legitimate, nondiscriminatory reason for taking the adverse employment action.  *See Goldstein v. Sprint/United Management Co.,* 2006 WL 2631948, at *7 (D. Kan. Sept. 13, 2006) (collecting cases and relying on *EEOC v. Horizon/CMS Healthcare Corp*., 220 F.3d 1184, 1192-94 (10th Cir. 2000) and *Bullington v. United Air Lines, Inc*., 186 F.3d 1301, 1316 n.11 (10th Cir. 1999)). The court, then, will not require plaintiff, as part of her prima facie case, to disprove defendant's proffered reasons for making the adverse employment decisions at issue.

Defendant also argues that plaintiff's failure to identify any similarly situated non-minority employees who were treated more favorably is "fatal" to her claims.  The Tenth Circuit, however, has expressly held that a plaintiff is not required to come forward with evidence of similarly situated employees to establish a prima facie case. *See Horizon/CMS Healthcare Corp*., 220 F.3d at 1195 n.6 ("Nothing in the case law in this circuit requires a plaintiff to compare herself to similarly situated co-workers to satisfy the fourth element of her prima facie case."). The court, then, summarily rejects this argument.

2.      Retaliation Claims

To establish a prima facie case of retaliation, plaintiff must show that she engaged in protected opposition to discrimination; that defendant took an adverse employment action against her which a reasonable person would have found materially adverse; and that a causal connection exists between the protected activity and the materially adverse action. *See Haynes v. Level 3 Communications, LLC*, 456 F.3d 1215, 1228 (10th Cir. 2006) (citing *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, --- U.S. ----, 126 S. Ct. 2405 (2006))).  In its motion for summary judgment, defendant concedes that plaintiff has established the first two elements of her prima facie case with respect to all claims but contends that summary judgment is nonetheless appropriate because plaintiff cannot establish a causal connection between her protected activity and any adverse actions taken by defendant.

*a.    Defendant's Knowledge of Plaintiff's Protected Activities*

With respect to all of plaintiff's retaliation claims except for her retaliatory discharge claim, defendant contends that plaintiff cannot establish a causal connection between her protected activity and the adverse employment actions because there is no evidence showing that the decisionmakers had knowledge that plaintiff had engaged in protected activity.  *See Petersen v. Utah Dept. of Corrections*, 301 F.3d 1182, 1188-89 (10th Cir. 2002) (To establish a prima facie case of retaliation, plaintiff must show, among other things, that the individual who made the decision regarding the materially adverse action had knowledge of plaintiff's complaint) (citing *Williams v. Rice*, 983 F.2d 177, 181 (10th Cir. 1993)); *Kendrick v. Penske Transp. Servs.,*

*Inc.*, 220 F.3d 1220, 1235 (10th Cir. 2000) (affirming dismissal of retaliation claim on summary judgment where plaintiff presented no evidence that decisionmaker knew of plaintiff's protected activity at time discharge decision was made); *Sanchez v. Denver Public Schools*, 164 F.3d 527, 534 (10th Cir. 1998) (same).

Plaintiff's MAP rating was prepared by Mssrs. Schmidt, Kern and Bokorae.  At the time Mr. Schmidt presented plaintiff with her MAP rating on November 25, 2002, the only complaint that plaintiff had asserted was her internal complaint to Ms. Nixon.  Plaintiff has directed the court to no evidence whatsoever that Mr. Kern knew of plaintiff's internal complaint at any time, much less that he knew about that complaint in November 2002.  In an apparent attempt to impute Ms. Nixon's knowledge of plaintiff's internal complaint to Mssrs. Schmidt and Bokorae, plaintiff asserts, without explanation, that Ms. Nixon directly supervises Mr. Bokorae and indirectly supervises Mr. Schmidt.  But there is no evidence that Ms. Nixon ever told Mr. Schmidt or Mr. Bokorae about plaintiff's internal complaint or that Mr. Schmidt or Mr. Bokorae otherwise had knowledge of plaintiff's complaint at the time they prepared plaintiff's MAP rating.  *See Weigley v. Western Florida Lighting, Inc.*, 2005 WL 3312319, at *5 (M.D. Fla. Dec. 7, 2005) (evidence that plaintiff advised decisionmaker's business partner about her protected activity insufficient to impute knowledge to decisionmaker).[2]  Summary judgment, then, is

---

[2]To the contrary, Ms. Nixon testified that she did not advise Mr. Schmidt or Mr. Bokorae about plaintiff's complaint at any time during plaintiff's employment.  Plaintiff urges the court to disregard this testimony on the grounds that Ms. Nixon's credibility, according to plaintiff, has been called into question over another portion of her testimony.  But even if the court disregards the testimony, the point remains that plaintiff has come forward with no evidence that Mr. Schmidt or Mr. Bokorae knew about plaintiff's complaint

appropriate with respect to plaintiff's retaliation claim stemming from her MAP rating.

There is evidence, however, that Mr. Schmidt and Mr. Bokorae learned about plaintiff's formal KHRC complaint in late January 2003 and, thus, that they had the requisite knowledge at the time Mr. Schmidt issued the first "final written warning" to plaintiff in late February 2003 and at the time Mssrs. Schmidt and Bokorae placed plaintiff on the PIP in March 2003. Specifically, plaintiff submitted a written memorandum to Mssrs. Schmidt and Bokorae on January 29, 2003 after the meeting in which Mssrs. Schmidt and Bokorae raised concerns about the Balance Bar contest.  In her memorandum, plaintiff indicates her suspicion that the Balance Bar investigation stems from her filing a formal complaint against defendant and otherwise indicates that she has been scrutinized ever since the filing of the complaint.  Without question, a reasonable jury could conclude, then, that Mssrs. Schmidt and Bokorae had knowledge of plaintiff's protected activity in late January 2003–prior to the issuance of the written warning and prior to placing plaintiff on a PIP.[3]  The court, then, rejects defendant's argument that no causal connection exists between plaintiff's complaints and her first written warning and the PIP.

Plaintiff's second "final" written warning was issued by Ms. Erlbacher in July 2002. Plaintiff has not come forward with any evidence (or even an argument) that Ms. Erlbacher knew about plaintiff's protected activities at the time she issued the written warning.  Absent such

at the time they prepared plaintiff's MAP rating in November 2002.

[3]Indeed, neither Mr. Schmidt nor Mr. Bokorae appear to dispute that they learned about plaintiff's complaint upon receiving her memorandum in late January 2003. Defendant's assertion, then, that plaintiff cannot establish that Mr. Schmidt knew about plaintiff's protected activity prior to issuing plaintiff the written warning is puzzling.

13

evidence, there is no causal connection and summary judgment is warranted on plaintiff's retaliation claim concerning her second written warning.

b.      *Causal Connection/Retaliatory Discharge Claim*

Defendant also contends that plaintiff has not shown the requisite causal connection between her discharge and her protected activities. To begin, defendant asserts that it did not terminate plaintiff's employment until five months after her third KHRC complaint. While the court generally agrees with defendant that a five-month lapse in time is insufficient, standing alone, to establish a causal connection, that principle does not apply where there is evidence that a pattern of retaliatory conduct begins shortly after the plaintiff's protected activity and only culminates later in the termination of the plaintiff's employment. *See Piercy v. Maketa*, 480 F.3d 1192, 1199 (10th Cir. 2007). While defendant did not terminate plaintiff's employment until nine months after her initial internal complaint and five months after her third KHRC complaint, the evidence, viewed in the light most favorable to plaintiff, demonstrates that a pattern of arguably retaliatory conduct began shortly after Mssrs. Schmidt and Bokorae learned about plaintiff's KHRC charge in late January 2003. Within weeks, plaintiff received a first "final" written warning and was placed on a PIP; the PIP, in turn, was the catalyst for plaintiff's discharge. A reasonable jury could conclude that this progressive discipline, which may have been intended to result in plaintiff's discharge, began to escalate soon after plaintiff's first KHRC charge.

Defendant, however, urges that the fact that it did not "seize" the first opportunity to

terminate plaintiff's employment as soon as she complained (and thereafter provided her "multiple chances" to improve her performance) belies a retaliatory intent and destroys any causal connection. While a reasonable jury might so conclude, a jury could also conclude–in light of plaintiff's additional circumstantial evidence discussed below–that defendant purposefully "extended" plaintiff's employment to avoid the appearance of retaliatory motive but intended all the while to terminate plaintiff's employment. In short, sufficient evidence exists demonstrating a causal connection between plaintiff's protected activity and the termination of her employment. Summary judgment on this issue is denied.

B.      *The Pretext Analysis*

For those claims with respect to which plaintiff has sufficiently established a prima facie case, the court now analyzes whether defendant has met its burden to articulate a legitimate, non-discriminatory or non-retaliatory reason for the adverse employment actions at issue and, if so, whether plaintiff has come forward with evidence from which a reasonable jury could conclude that those reasons are pretextual. Defendant contends that it did not promote plaintiff to an RCM position because she was less qualified than the successful candidates; that it issued plaintiff a "more is expected" MAP rating and placed her on a PIP because plaintiff's performance was deficient; that it issued plaintiff her first written warning based on her misrepresentation in connection with the Balance Bar sales contest; that it issued plaintiff her second written warning based on her failure to be at her assigned stores as scheduled; and that it terminated plaintiff's employment based on her continued poor performance.

Plaintiff concedes that defendant has met its burden of production and, thus, the burden shifts back to plaintiff to demonstrate that defendant's proffered reasons are pretextual. *See Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1181 (10th Cir. 2006).  To show that an employer's proffered non-discriminatory or non-retaliatory reason for an employment action is pretextual, "a plaintiff must produce evidence of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Id.* at 1183 (quoting *EEOC v. BCI Coca-Cola Bottling Co.*, 450 F.3d 476, 490 (10th Cir. 2006)).  As explained below, the court concludes that plaintiff, with the exception of her failure-to-promote claim, has satisfied her burden.  Thus, summary judgment is granted in favor of defendant on plaintiff's failure-to-promote claim and a trial is required on plaintiff's remaining claims.

1.      Failure to Promote

Plaintiff contends that defendant, based on plaintiff's race, failed to promote her to one of three open RCM positions in the fall of 2001.  It is undisputed by plaintiff that the three successful candidates were all selected by Jana Fitchett who, at the time, was defendant's Customer Business Manager for the Kansas City region.  Defendant's evidence reflects that Ms. Fitchett selected the three successful candidates because they were the Kansas City team's top performers and all three individuals performed in the "excellent" range as defined by defendant's MAP process.  Defendant's evidence further reflects that Ms. Fitchett, at the time of the selection

decisions, believed that plaintiff's performance was in the "good" range as defined by the MAP process.

In an effort to show pretext, plaintiff asserts that she was more qualified than two of the successful candidates in that she had more work experience, a similar educational background and, on occasion, higher distribution numbers. Plaintiff, however, does not contend that the successful candidates were not qualified for the RCM position. As such, plaintiff's testimony regarding the relative qualifications of the successful candidates and herself does not raise a triable issue on pretext. *Compare MacKenzie v. City & County of Denver*, 414 F.3d 1266, 1278 (10th Cir. 2005) (plaintiff's assertion of pretext based on her subjective belief that she was more qualified than successful candidate insufficient to survive summary judgment; "[u]nless the disparity in employees' qualifications are obvious, 'we judges should be reluctant to substitute our views for those of the individuals charged with the evaluation duty by virtue of their own years of experience and expertise in the field in question.'") *with Abuan v. Level 3 Communications, Inc.*, 353 F.3d 1158, 1169-70 (10th Cir. 2003) (suggesting that inference of discrimination may arise if replacement was wholly unqualified for the position; evidence supported jury verdict in favor of plaintiff in part because plaintiff was replaced by someone who lacked the technical expertise required for the position such that plaintiff's former job duties had to be divided up among three other workers).

Plaintiff also contends that pretext is shown because her manager, Loren Kern, advised her that the successful candidates were selected based on seniority, which contradicts the reason given by Ms. Fitchett. She further suggests that Mr. Kern deliberately lied to her about the

rationale underlying the selection decisions.  Even assuming that Mr. Kern lied to plaintiff, that fact does not cast doubt on the credibility of the reason articulated by Ms. Fitchett, the sole decisionmaker, where there is simply no evidence that Ms. Fitchett did not actually base her selection decisions on the performance of the successful candidates and there is no evidence that she ever articulated to anyone, including Mr. Kern, any reasons for the selection decisions other than the superior performance of the successful candidates.

Plaintiff does not offer any other evidence to support a finding of pretext with respect to her failure-to-promote claim.  Because the evidence that she has presented is insufficient to permit a jury to find in her favor, summary judgment on this claim is granted.

2.     Negative MAP rating

Having granted summary judgment on plaintiff's retaliation claim stemming from her negative MAP rating, the court analyzes whether plaintiff has come forward with sufficient evidence of pretext such that a jury could reasonably conclude that defendant issued plaintiff a "more is expected" MAP rating based, even in part, on her race.  In support of her pretext showing, plaintiff avers that, at the time she received the rating, she was performing at a higher level than her sales team's averages.  Specifically, plaintiff avers that she was ranked in the top three of her sales team in "call coverage"; that she ranked in the upper half of her team in distribution; and that she ranked very high (first, second or third in several categories) in merchandising.  Indeed, the MAP itself appears to reflect that plaintiff's performance was higher than her coworkers in several key areas and even expressly recognizes that plaintiff "ranks high

among her peers." The MAP also expressly recognizes that she only "occasionally" falls short of performance expectations and outperforms her team average for call coverage and distribution. Inexplicably, then, the MAP also states that plaintiff's performance is "consistently low within her peer group." The language of the MAP itself, then, casts some doubt on whether defendant honestly believed that plaintiff's performance was deficient.

Moreover, plaintiff's MAP rating was expressly based in part on plaintiff's failure to follow up on a May 6, 2002 memorandum detailing specific training opportunities that defendant expected plaintiff to undertake. Plaintiff asserts, however, that she never received a copy of the memorandum and, in fact, saw the memorandum for the first time on November 25, 2002 in connection with her performance review.[4] She avers that she advised Mr. Schmidt at the November 25, 2002 meeting that she had never before seen the memorandum and advised him again by letter shortly thereafter. She also insisted to Mr. Schmidt that she would have embraced those training opportunities if she had received the memorandum. Nonetheless, plaintiff's evidence reflects that defendant did not provide plaintiff with an opportunity to undertake the training at any time after November 25, 2002–a fact from which a jury could reasonably infer that defendant was not genuinely interested in helping plaintiff improve her performance. In short, plaintiff has satisfied her pretext burden with respect to her claim that defendant issued

---

[4]Plaintiff asserts that the fact that she did not see the May 6, 2002 memorandum until November 2002 indicates that the memorandum was "fabricated and backdated" by "someone at Kraft." The record is devoid of any evidence remotely suggesting that the document was not actually drafted in May 2002 and plaintiff's characterization of the memorandum–regardless of whether she did not actually receive the memorandum until November 2002–is irresponsible.

her a negative MAP rating based on her race.

3.     Written Warnings, PIP and Discharge

The court turns, then, to analyze plaintiff's pretext evidence with respect to her written warnings, her placement on the PIP and her discharge.  As noted above in connection with the discussion of plaintiff's prima facie case, the evidence viewed in the light most favorable to plaintiff demonstrates that a pattern of arguably retaliatory conduct began shortly after Mssrs. Schmidt and Bokorae learned about plaintiff's KHRC charge.  Although Mssrs. Schmidt and Bokorae met with plaintiff on January 29, 2003 to discuss at some length her conduct during the contest, no written warning was issued until almost three weeks later–after Mssrs. Schmidt and Bokorae received plaintiff's memorandum in which she discussed her formal complaint against defendant.  It is reasonable to infer, then, that the decision to issue a final written warning was not made until after plaintiff filed her formal charge (and, conversely, that defendant would have considered the issue closed after the in-person meeting in late January 2003 but for the charge).

In addition to the timing of the events occurring in 2003, other evidence of pretext exists sufficient to support plaintiff's retaliation and race discrimination claims.  One could conclude, for example, that plaintiff's explanation for her conduct in the Balance Bar contest (that she truthfully answered the questions based on her understanding that a product is considered "on the shelf" when a store places an order for the product, tags are placed on the shelves and space is made on the shelves for the product) should have been satisfactory to Mr. Schmidt, who testified that he would give a sales representative "credit if they just had the tag on the shelf with

the space for the product." This, too, casts doubt on the motive underlying the final written warning. Moreover, the subject of the written warning is not limited to plaintiff's conduct in the sales contest despite defendant's insistence that the warning stemmed solely from the Balance Bar contest; rather, the warning also notifies plaintiff of a forthcoming PIP based on her "continued deficient job performance." While there is some evidence that defendant required a PIP for all employees who received a "more is expected" MAP rating, the record suggests that defendant made no movement to implement a PIP plan for plaintiff until after she filed her first formal complaint. That is, plaintiff received her MAP rating in late November 2002 and it appears that defendant made no mention of a PIP until nearly three months later, in late February 2003 in connection with the written warning and only after plaintiff filed her charge.

The requirements of the PIP itself raise some question about defendant's motive. Plaintiff avers that the PIP held plaintiff to a significantly higher standard of performance than that required of other sales representatives. While defendant responds to plaintiff's testimony as "conjecture," plaintiff offers specific examples in her affidavit. For example, plaintiff highlights that the PIP required plaintiff to have 90 percent distribution of certain grocery items when other sales representatives had a goal of 80 percent distribution and could average items with a high distribution against items with a lower distribution. According to plaintiff, this disparity evidences that defendant did not intend for plaintiff to improve her performance but rather intended to render plaintiff's success under the PIP an impossibility. Indeed, plaintiff's evidence suggests that plaintiff's performance improved under the PIP (and that in many specific areas her performance was higher than the goals set for other sales representatives) but that defendant

terminated her employment in any event for failure to meet performance goals that, according to plaintiff's evidence, were higher than any other sales representative was asked to achieve.[5]

The July 9, 2003 final written warning is similarly suspect when the evidence is viewed in the light most favorable to plaintiff. Although defendant asserts that the warning was issued based on plaintiff's failure to be at her assigned store as scheduled, plaintiff avers that she had contacted Ms. Erlbacher earlier that morning to specifically advise her that she would not be at her first store as scheduled but would arrive later in the morning. Plaintiff further avers that she was permitted to alter her schedule at any time as long as she notified her supervisor of any changes in her schedule. In addition, the warning notes that it marks "the fifth occasion of you not being at your stores as scheduled." Defendant does not provide any evidence of any other occasions and plaintiff avers that, in fact, the statement is simply untrue.

For the foregoing reasons, plaintiff has sufficiently cast doubt on defendant's reasons for issuing the first written warning, placing plaintiff on the PIP, issuing the second written warning and terminating plaintiff's employment. Having satisfied her burden as to these claims, plaintiff's claims require a trial.

---

[5]Although defendant makes much of the fact that it "extended" plaintiff's PIP by an additional 30 days, the evidence demonstrates that plaintiff's 90-day PIP period had long expired when defendant purported to "extend" it. In other words, plaintiff's PIP by its express terms ended on June 9, 2003 yet defendant did not "extend" the PIP until early July 2003. Surely, a reasonable jury could conclude that this gap was simply an oversight on the part of defendant and no more than a technicality at most. But a jury could also reasonably conclude that plaintiff had satisfied the requirements of her PIP as evidenced by the fact that the June 9, 2003 deadline passed without the termination of plaintiff's employment and without further word from defendant until early July 2003.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's motion for summary judgment (doc. 39) is granted in part and denied in part.

**IT IS SO ORDERED.**

Dated this 1ˢᵗ day of June, 2007, at Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge